IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
April 21, 2010 Session

**STATE OF TENNESSEE V. RODRICKUS CARLOS JEFFERSON**

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2007-B-886      Mark J. Fishburn, Judge**

**No. M2009-01279-CCA-R3-CD - Filed May 10, 2011**

Following a jury trial, Defendant, Rodrickus Carlos Jefferson, was convicted of first degree premeditated murder and sentenced to life imprisonment with the possibility of parole. On appeal, Defendant argues: (1) that the evidence is insufficient to support his conviction; (2) that the trial court erred in allowing him to represent himself; and (3) the trial court erred in failing to instruct the jury on self-defense. After a thorough review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which DAVID H. WELLES and JOHN EVERETT WILLIAMS, JJ., joined.

Peter D. Heil, Nashville, Tennessee (on appeal) and Mark Anthony Kovach, Nashville, Tennessee (at trial) for the appellant, Rodrickus Carlos Jefferson.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel, Victor S. (Torry) Johnson, III, District Attorney General; Sarah Davis, Assistant District Attorney General; and Janice Norman, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

**I. Background**

During the early morning hours of January 14, 2007, the victim, Antonio Greer, was shot while in the back room of a house located at 1917 Cephas Street in Nashville. Pamela Jenkins Butler, the owner of the house, testified that prior to the shooting, she was in her bedroom playing poker with Pamela Key. Ms. Butler admitted that many people went in and

out of her house and that "drugs, prostitution, whatever," went on in the residence. She also admitted that she had been using crack cocaine at the time of the shooting. Ms. Butler testified that Defendant sold powder cocaine and occasionally "hung out" at her house.

Ms. Butler testified that Defendant, Fred Ewing, the victim, Eric Fleming, and Ms. Butler's boyfriend, Chaston Donta Nix, were at the residence before the shooting. At some point, she looked out the window and saw Defendant and the victim arguing outside. She thought that the argument concerned guns, and Mr. Fleming was trying to get the two men to compromise. She did not see a weapon at that time. Ms. Butler then saw Defendant, the victim, and Mr. Fleming walk back into the house and into the back room. Ms. Butler testified that she later heard a gunshot as she was standing in the doorway of her bedroom, and Pamela Key ran past her yelling, "he shot the boy in the head." She said that Ms. Key ran to the front door, but had a hard time opening it because there were some glasses behind the door, and it would not open very wide. Others ran past Ms. Butler, and she ran into her bedroom. Ms. Butler said that she saw Defendant run out of the back room and to the side door. He had a gun his right hand, and he had to move a chair and a stick that he had placed against the door earlier in the week to get out of the house. By that time, Ms. Butler had called police and thought that she told them that Defendant had a gun. She did not believe that she initially told police that Mr. Fleming was in the house at the time of the shooting. Ms. Butler testified that at some time prior to the shooting, she had seen Mr. Fleming standing in the back room beside a chest where the video game console was located. She could not see Defendant. She thought that Mr. Nix was in the living room at the time, and Mr. Ewing was near the bathroom.

On cross-examination, Ms. Butler testified that a couch and a shelf with glasses were behind her front door. She admitted that she initially lied to police because she did not want anyone to get in trouble, but she later decided to tell the truth. Ms. Butler testified that she told police that "somebody had ran in behind this guy and shot him trying to rob him." She did not report a home invasion.

Pamela Key testified that prior to the shooting, she gave the victim two or three dollars to give her a ride to Ms. Butler's house to play cards and smoke crack cocaine. When they arrived, she and the victim both went inside. Ms. Key testified that while she and Ms. Butler were playing cards in Ms. Butler's bedroom, she heard Mr. Fleming say, "no, no, don't do that, don't do that." She then walked to the back room and asked what was going on, and the victim indicated that he was okay. Ms. Key testified that she and Ms. Butler continued playing cards, and when they were finished, she walked back into the room and asked the victim if he was ready to leave. She said that the victim, who was sitting on the couch, indicated that he needed to drive Defendant somewhere. She and Mr. Fleming, her former boyfriend, then began arguing about where she purchased her drugs. Neither the victim nor the Defendant were involved in the argument. Ms. Key testified that she said,

"Man, this shit crazy, ain't it," and when the victim indicated that he agreed with her, Defendant shot him  in the face at close range.

Ms. Key testified that she waited until Defendant ran out the back door, and she ran out the front door of the house yelling that Defendant had killed the "boy."  She then ran to a friend's house and told them to call police because "a boy" had been killed at Ms. Butler's house.  She did not know the victim's name at the time.  Ms. Key testified that some time after the shooting, she was approached by Lisa Bridges, who was her cousin and Defendant's girlfriend, about the shooting.  She said that Ms. Bridges told her that the victim had been shot three times and that Ms. Key was lying about him being shot one time. Ms. Key testified that Ms. Bridges also gave her twenty dollars and told her to keep her "mouth closed."

Chaston Nix testified that he arrived at Ms. Butler's house around 4:00 or 5:00 p.m. on January 13, 2007.  He was there for a while and then Pamela Key and the victim arrived. Mr. Nix testified that he left the residence a couple of times, and when he returned, Eric Fleming, Fred Ewing, and Defendant were there.  Mr. Nix testified that at some point, he and the victim walked out of the house and were talking to some people outside.  He said that the victim gave him the keys to his car, and asked Mr. Nix to drive over to 12th Street and pick up his brother, Dominique.  When Mr. Nix arrived at the residence, Dominique's mother informed him that Dominique was not home.  Mr. Nix testified that he drove back to Cephas Street, and the victim was still outside talking.  He then returned the victim's keys to him. Mr. Nix testified that he had previously asked the victim to drive him to a store, and he asked the victim a second time; however, the victim indicated that he was waiting on something. Mr. Nix then walked up the street and "caught" a ride to a store at Metro Center.

Mr. Nix testified that when he returned from the store, he walked in the side door of the house and saw Defendant standing in the doorway of the back room.  The victim was sitting on the couch, and Eric Fleming was also in the room. Ms. Butler and Ms. Key were in Ms. Butler's room playing cards.  Mr. Nix testified that Defendant asked him for some tissue, and when Mr. Nix refused get it, Mr. Ewing went to the bathroom to get it for him. Mr. Nix said that as he was sitting in the living room drinking beer and smoking cigarettes, he heard some glass breaking and a gunshot.  He then heard Ms. Key scream "that boy shot him or something, in the face or something like that." Mr. Nix testified that he, Ms. Key, and Mr. Ewing all ran to the front door and were trying to get out of the house.  He did not see anyone else leave the house.  Mr. Nix testified that he went back in the house to check on Ms. Butler and saw the victim "slanted over on the couch." He then ran to the  house on 12th Street and told Dominique and his mother what happened.  Mr. Nix and Dominique then returned to Ms. Butler's house.  They later spoke with detectives.

Fred Ewing testified that he was at Ms. Butler's house on January 14, 2007, to find crack cocaine.  When he first arrived, some men were standing in the yard, and he went

inside the house to speak with Ms. Butler. Mr. Ewing testified that while he was in the house, Defendant asked a man two or three times for some toilet paper. He said that the man did not "move," so Mr. Ewing volunteered to get the toilet paper for Defendant. As he was returning from the bathroom, Mr. Ewing testified that he heard a gunshot. He said:

> I tried to get out the front door but I couldn't and I had to go back and tried to get out and I said forget it everybody was on my back when I was trying to get out the front door and I said I will just go out the side door then I just went out the side door and went around the block and sat down.

Mr. Ewing did not know who all was in the house at the time of the shooting. He said that before the shooting, he heard someone say "what is all of this stuff or something that you have been talking" or something similar to that. Mr. Ewing testified that Defendant did not seem to be arguing with anyone before the shooting and that "it just popped off so fast that you wouldn't believe it." He said that the side door of the house was already open when he ran out. Mr. Ewing testified that he was eventually interviewed by police and identified Defendant from a photographic line-up.

Officers John Roberson and Atif Williams of the Metropolitan Nashville Police Department, North Crime Suppression Unit, responded to the shooting on January 14, 2007, around 3:45 a.m. There were several people standing on the porch when the officers arrived, and they were informed that "the dude that had been shot was in the back bedroom." The front door was open, and the officers went inside to clear the house. Pamela Jenkins [Butler] was in a bedroom to the left yelling and "ranting and raving." The officers also noticed that the side door of the residence was open. They found the victim in the back room sitting on the couch with his feet on what appeared to be a small dresser. A video game controller was still in his hand, and there was bloody money at his feet. Officer Roberson then set up a perimeter around the house, and Officer Williams secured Ms. Butler in his patrol car. Officer Williams testified that Dominique Wallace walked up to the scene with Chaston Nix and said that the victim was his brother-in-law and that Defendant shot him.

Officer Lynette Mace of the Metropolitan Nashville Police Department, ID Unit, testified that she and Officer William Fleak processed the scene on January 14, 2007. Officer Mace testified that she was assigned to photograph the residence, and she processed the scene for fingerprints. She saw the victim in a back room lying back on the couch with his feet propped on a table that was partially overturned. It appeared that he had been playing a football video game, and there was some money on the floor in the doorway leading "from the kitchen from the rear room, that had what appeared to be blood on it." Officer Mace testified that she collected a liquor bottle, a spent shell casing, and two game controllers. She said that there was a large couch partially blocking the front door of the residence, and there was what appeared to be a crack pipe and some lighters in the first

-4-

bedroom that were collected by patrol officers. Electronic scales and a white rock substance in a baggy were also collected. Officer Warren Fleak testified that he diagramed the scene, and he also processed the scene for fingerprints. One of the items that he processed was a metal pipe that had been used to secure one of the doors.

Detective Jim Fuqua of the Metropolitan Nashville Police Department, North Investigative Unit, testified that he was called to the shooting around 3:30 or 4:00 a.m. and was later assigned as the lead detective. Detectives Robert Russell, Robert Hanson, and Viviyonne Watson also worked on the case. Detective Fuqua walked through the residence and saw the victim lying on a couch with a bloody wound on the left side of his neck and face. He and Detective Hanson then took Pamela Butler and Chaston Nix to the North Station for interviews, and they were later released. Detective Fuqua testified that he received information that Defendant was a suspect in the case, and Detective Hanson then prepared a photographic line-up. Detective Fuqua later showed the line-up to Ms. Butler, Pamela Key, and Fred Ewing, and they identified Defendant as the person who shot the victim. He also interviewed Eric Fleming and Defendant's girlfriend, Lisa Bridges. Detective Fuqua testified that Ms. Butler did not initially tell him that she saw Defendant with a gun after the shooting. However, she later told him about it on the day of the preliminary hearing.

Detective Fuqua testified that at some point during the investigation, he and Detective Jeff Robinson pulled records from the Davidson County Sheriff's Office of jail phone calls between Defendant and Lisa Bridges. Most of the calls were made before and after the preliminary hearing. Defendant indicated that he wanted Ms. Bridges to prevent "Pam" and "D" from testifying at the preliminary hearing because he thought that the charges against him would be dismissed. He told her to ride them around and get a room. During another call, Defendant had Ms. Bridges use three-way calling to call several individuals and tell him that he was out of jail so that witnesses would be afraid to show up for court. Defendant also told Ms. Bridges to find Ms. Key and see what she knew. He wanted Ms. Bridges to convince Ms. Key that she [Ms. Key] did not see anything.

Officer Lorita Marsh, a latent print examiner for the Metropolitan Nashville Police Department, testified that she examined latent prints received from Officers Marsh and Fleak. She said that two prints lifted from a Scarface video game belonged to Eric Fleming.

Dr. Bruce Levy performed an autopsy on the victim and determined that he died from a single gunshot wound to left side of his jaw. He said that the shot was unusual because the bullet traveled through the victim's chin and re-entered his neck. The bullet then struck major blood vessels leading from the heart to the brain, the airway in the middle of the victim's neck, his right lung, and liver. It was Dr. Levy's opinion that the gun was between six inches and two feet from the victim's face when the shot was fired. He further opined that the

victim was sitting on the couch and was shot by someone standing in front of him. The toxicology report indicated that the victim was under the influence of alcohol, cocaine, and marijuana at the time of his death.

Lashonda McQueen testified that the victim was her fiancée, and Dominique Wallace is her brother and was a friend of the victim. She last saw the victim on his birthday, January 13, 2007, around 11:00 or 11:30 p.m. Ms. McQueen testified that the victim left her house and was going to her mother's house on 12th Avenue North to look for Mr. Wallace. She later received a call around 3:30 to 3:45 a.m. from her mother indicating that the victim had been shot. Ms. McQueen then drove to 1917 Cephas Street and saw police and ambulance personnel. She also saw Eric Fleming and some others that she had seen before. Ms. McQueen testified that her mother's house on 12th Avenue is located very close to 1917 Cephas Street.

Dominique Wallace testified that approximately a week before the shooting, he was carrying two guns that belonged to the victim when he got into a car with Defendant. He said that Defendant hid the guns in his car and drove him and someone named "Allen" to look at a house. When Mr. Wallace and "Allen" got out of the car, Defendant drove away with the guns and left the two men at the house. Mr. Wallace testified that Defendant never returned the guns to him or the victim.

Mr. Wallace testified that on the night of the shooting, he was supposed to meet the victim at his residence on 12th Avenue, and they were going to "hang out." However, he had gone to get something to eat when the victim came by to pick him up. Mr. Wallace testified that he was later awakened by Chaston Nix who told him that the victim had been shot. He then ran to the residence on Cephas Street with Mr. Nix. The police were there when he arrived, and he also saw Eric Fleming.

Lawanda Sparks, who was friends with Defendant and his sister, testified that Defendant and another man showed up at her apartment one afternoon in January of 2007 and asked to use the restroom. She knew that Defendant was "on the run," and he showed her a "wanted ad" that had been printed from the internet. Ms. Sparks testified that she asked Defendant about what happened. She said:

> I think he, I remember as far as I remember he was saying something like, you know, the argument was over or something, they might have sat back down or something and that is when he told me that he shot [the victim] with his own gun, and he had the gun.

Ms. Sparks testified that Defendant then pulled out a gun and said that it was the one that he used to shoot the victim. She then suggested that Defendant turn himself in and he "said

something about, you know, what happened to the last mother f------ that told me that."
After Defendant left, Ms. Sparks called police.

Defendant admitted that he was at the residence on Cephas Street at the time of the shooting, even though he told detectives that he was not there. He also wrote a letter to the assistant district attorney general stating that he was not there at the time of the shooting. Defendant testified that he never told Ms. Sparks that he shot the victim with the victim's own gun, but he said that someone else shot the victim with his own gun. He said that he showed his gun to Ms. Sparks and told her that it was not used in the crime.

Defendant claimed that at the time of the shooting, he was standing in the kitchen talking to Mr. Nix and asking him for some tissue. He said that he heard a shot in the back room while Mr. Ewing was getting the tissue for him, and he then ran out the back door. Defendant testified that he was never in the back room and that he had seen Ms. Key, the victim, and Eric Fleming in the room. He said that he and the victim's brother-in-law [Dominique Wallace] were mad at each other over "some stuff," but he did not have a problem with the victim. Defendant claimed that from prior experience, he felt that Ms. Key brought the victim to Ms. Butler's house for the purpose of having Mr. Fleming rob the victim.

Defendant admitted that he made several phone calls from the jail. He said:

When I made them phone calls I was actually calling to get Pam Key not to show up for Court and I was also trying to get Eric Fleming and Pam Butler for the simple fact that I told then that if they actually come to Court I was going to tell on them.

On cross-examination, Defendant admitted that Mr. Wallace had left two guns in his car. He said that he thought the guns belonged to Mr. Wallace, and he later gave them back to the victim. Defendant testified that he was at the house on the night of the shooting for ten or fifteen minutes to buy cocaine from his friend, Mr. Fleming. However, he did not get a chance to buy anything because he was talking to Mr. Nix. Defendant testified that he did not know who shot the victim, and he did not see any guns at the time. He said that the victim, Ms. Key, and Mr. Fleming were in the back room at the time of the shooting. Defendant admitted that he went into hiding after the shooting, and when he was found and interviewed by police, he repeatedly told them that he was not at the house. Defendant testified that when detectives told him that witnesses might have seen him running from the house, he told them that he walked up to the side of the house and knocked on the door, but ran after he heard a shot.

Defendant admitted that he told Lisa Bridges that he needed two witnesses, "Tweety" and "Kim" to show up for court and say that he was with them at the time of the shooting. He said that he was trying to influence Ms. Key's testimony and prevent witnesses from testifying because he did not commit the crime and did not want anyone to "do this old flip stuff saying that I did it and all of that." He also claimed that he asked Mr. Fleming to change his story to police because he was trying to help Mr. Fleming and cover for Mr. Fleming shooting the victim. Defendant admitted that he told Ms. Bridges that he shot the victim in self-defense. He acknowledged that he wrote a letter to the prosecutor indicating that he saw Mr. Ewing and Mr. Nix with guns on the night of the shooting and that Mr. Nix had told him that Mr. Ewing shot the victim. Defendant admitted that he had told several different versions of what happened.

## II. Analysis

### A. Sufficiency of the Evidence

Defendant argues that the evidence was insufficient to support his conviction of first degree murder because the State failed to prove premeditation beyond a reasonable doubt.

When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced on appeal with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id.*; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

Defendant was convicted of first degree premeditated murder, which is a premeditated and intentional killing of another. T.C.A. § 39-13-202(a)(1). An act is premeditated if the act is done after the exercise of reflection and judgment. *Id.* at (d). Furthermore,

Premeditation means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.*

The element of premeditation is a question of fact for the jury to determine based upon consideration of all of the evidence. *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000) (citing *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997). Because premeditation involves the defendant's state of mind, concerning which there is often no direct evidence, Tennessee cases have long recognized that premeditation may be proved by circumstantial evidence. *State v. Davidson*, 121 S.W.3d 600, 614-616 (Tenn. 2003) (citing *State v. Brown*, 836 S.W.2d 530, 541 (Tenn. 1992)). Our supreme court has provided a list of non-exclusive circumstances that would justify a jury in finding or inferring premeditation: the use of a deadly weapon on an unarmed victim; the particular cruelty of a killing; the defendant's threats or declarations of intent to kill the victim; the defendant's procurement of a weapon; preparations taken to conceal the crime undertaken before the crime is committed; destruction or secretion of evidence of the killing; and the defendant's calm demeanor immediately after the killing. *State v. Pike*, 978 S.W.2d 904, 914-15 (Tenn.1998); *Bland*, 958 S.W.2d at 660. A jury, however, is not limited to any specific evidence when determining whether a defendant intentionally killed the victim after the exercise of reflection and judgment. *See* T.C.A. § 39-13-202(d). All of the circumstances of the offense and the defendant's conduct may be considered in determining whether the act was premeditated. *Davidson*, 121 S.W.3d at 615 (citing *State v. LaChance*, 524 S.W.2d 933, 937 (Tenn. 1975)).

Viewing the evidence in a light most favorable to the State, the proof established that Defendant shot the unarmed victim without provocation in the back room of Pamela Butler's house. Prior to the shooting, Ms. Butler had looked out her bedroom window and saw Defendant and the victim arguing outside. She thought that the argument concerned guns, but she did not see any weapons at the time. The two men later walked back inside Ms. Butler's house with Eric Fleming and went into a back room.

Pamela Key testified that she had been playing cards with Ms. Butler before the shooting. At some point, she walked into the back room to ask the victim if he was ready to leave. While in the room, Ms. Key got into an argument with Mr. Fleming, her former boyfriend, over where she purchased her drugs. Neither the victim nor the Defendant were involved in the argument. Ms. Key testified that Defendant then removed a handgun from

under his coat, and shot the victim, who was sitting on the couch, in the face. After the shooting, Ms. Butler saw Defendant run out of the back room and flee the house with a gun his right hand.

Fred Ewing testified he had been standing near Defendant before the shooting and had walked to the bathroom to get Defendant some toilet tissue when he heard the shot. When asked if Defendant seemed to be in an argument with anyone, Mr. Ewing said:

No. He was cool like he always is. I mean, wasn't nothing going on. I mean, it seems like it just something had to pop off like I don't know it was, I don't know what could have happened, I, you know, it could have been something that happened before I got there or something. I don't know what happened. I don't know it just popped off so fast that you wouldn't believe it.

Lawanda Sparks testified that Defendant showed up at her apartment one afternoon in January of 2007, sometime after the murder. She knew that Defendant was "on the run," and he showed her a "wanted ad" that had been printed from the internet. Ms. Sparks testified that when she asked Defendant about the murder, he said:

I think he, I remember as far as I remember he was saying something like, you know, the argument was over or something, they might have sat back down or something and that is when he told me that he shot [he victim] with his own gun, and he had the gun.

Defendant then pulled out a gun and said that it was the one that he used to shoot the victim. Defendant went into hiding after the shooting and after his arrest, gave several different versions of what happened at the time of the murder.

The State sums up its argument that sufficient evidence of premeditation exists as follows:

From the evidence presented at trial, the jury could reasonably infer that the defendant and the [victim] had argued in the front yard shortly prior to the shooting. They came into the house and were calm, allowing some "cooling off" for the parties. With no provocation, the defendant drew a loaded weapon and shot the victim at close range. The jury could reasonably infer from the calm circumstances before the shooting, the lack of provocation and the cool, calm demeanor of the defendant immediately prior to the shooting, that the murder was premeditated.

We agree with the State's argument, and only add that the victim was unarmed.

Defendant is not entitled to relief on this issue.

## B.  Self-representation

Next, Defendant asserts that the trial court erred by permitting him to represent himself at trial.  He contends that the waiver of his right to counsel was not knowingly and intelligently made because the trial court failed to adequately question Defendant concerning his ability to represent himself, and there was no written waiver of his right to counsel as required by Rule 44 of the Tennessee Rules of Criminal Procedure.

The right to assistance of counsel in the preparation and presentation of a defense to a criminal charge is grounded in both the Tennessee and United States Constitutions.  *See* U.S. Const. amend. VI; Tenn. Const. art. I, § 9. There also exists an alternative right-the right to self- representation-which is necessarily implied by the structure of the Sixth Amendment. *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); *State v. Northington*, 667 S.W.2d 57, 60 (Tenn.1984).  "The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails."  *Northington*, 667 S.W.2d at 60 (quoting *Faretta*, 422 U.S. at 821-22, 95 S.Ct. at 2533).

The exercise of the right to self-representation depends, in large part, upon a knowing and intelligent waiver of the right to counsel.  *Id*.; *State v. Burkhart*, 541 S.W.2d 365 (Tenn. 1976)); *State v. Herrod*, 754 S.W.2d 627, 629-630 (Tenn. Crim. App. 1988). Consequently, in cases where the accused states a desire to represent himself or herself at trial, the trial court has a duty to first determine whether the waiver is knowing and intelligent.  In *Johnson v. Zerbst*, 304 U.S. 458, 465, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), the United States Supreme Court placed "the serious and weighty responsibility ... of determining whether there is an intelligent and competent waiver" directly upon the trial judge.  More specific guidelines were subsequently established in *Von Moltke v. Gillies*, 332 U.S. 708, 723-724, 68 S.Ct. 316, 323, 92 L.Ed. 309 (1948), wherein the Supreme Court stated that

[A] judge must investigate as long and as thoroughly as the circumstances of the case before him demand. The fact that an accused may tell him that he is informed of his right to counsel and desires to waive this right does not automatically end the judge's responsibility. To be valid such waiver must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter. A judge can make certain that an accused's professed waiver of counsel is understandingly and wisely made only from a penetrating and comprehensive examination of all the circumstances under which such a plea is tendered.

In *Smith v. State*, 987 S.W.2d 871 (Tenn. Crim. App. 1998), this Court recommended that in cases where a defendant aspires to proceed *pro se*, the trial court should conduct its inquiry in accordance with the guidelines contained in *1 Bench Book for United States District Judges* 1.02-2 to -5 (3d ed .1986) (for ease of reference, the guidelines were reprinted in the appendix to *Smith* ).

Rule 44 of Tennessee's Rules of Criminal Procedure states the following:

(a) Right to Assigned Counsel. - Every indigent defendant is entitled to have assigned counsel in all matters necessary to the defense and at every state of the proceedings, unless the defendant waives counsel.

(b) Waiver. -
(1) Actions by the Court. - Before accepting a waiver of counsel, the court shall:

> (A) advise the accused in open court of the right to the aid of counsel at every stage of the proceedings; and

> (B) determine whether there has been a competent and intelligent waiver of such a right by inquiring into the background, experience, and conduct of the accused, and other appropriate matters.

(2) Written Waiver. - A waiver of counsel shall be in writing.

(3) Record of Waiver. - An accepted waiver of counsel shall be in the record.

The record in this case demonstrates that the trial court substantially complied with guidelines set forth in the *Bench Book for United States District Judges.* Before trial, Defendant addressed the court and asked to represent himself "so I can present the evidence that I need to present because Mr. Kovach is not willing to present this evidence." He then asked if trial counsel could remain as "elbow" counsel to help him. A discussion was then had about the disagreements in strategy between Defendant and trial counsel, and trial counsel indicated that he was willing to comply with Defendant's requests concerning strategy. However, trial counsel told the court that "he feels that he can present it better than I can, your Honor. but [sic] this is what he wants to do. I will be more than happy to stay on an help him." Defendant informed the court that he needed assistance "to determine what is admissable [sic] and what is not admissable[sic]."

The trial court then asked Defendant his age, educational training, if he had any formal legal training, and if he had ever been involved in any type of legal proceedings. Defendant responded that he got his GED and had some college training. He said that he had helped in other people's cases by "[w]riting motions and looking up certain, looking up information in law books and stuff like that." Defendant told the court that he understood the charges against him and that his theory of defense was that he was outside the house when the shooting occurred. He also knew the lesser-included offenses to first-degree murder, although he confused them with possible defenses. Defendant told the trial court that he was aware of the State's evidence, and he understood the possible sentences that he faced. The trial court questioned Defendant about his knowledge of the Rules of Evidence and the rules of Criminal Procedure, and Defendant indicated that he had read them while incarcerated. The trial court asked Defendant if he understood that if he testified on his own behalf, he could not "just get on the stand and give a narrative of what happened." The court also informed Defendant that he would have to ask himself questions and respond to those questions and not just tell his side of the story.

Defendant told the court that he understood the range of punishment for the lesser-included offenses of first-degree murder, and the court advised Defendant that he would be a Range II offender for second-degree murder. Defendant said that he had previously been convicted of burglary, aggravated assault, and a drug charge, and he understood that the State might be allowed to present evidence of those prior convictions if he testified. Defendant told the trial court that he understood that if he failed to make appropriate objections, he might lose the issue for appeal purposes. He indicated that he did not "really" understand appeals and trying to preserve the record for appeal, but it was something that he could study and work on in post-conviction. Defendant also said: "If I am convicted I can just accept my punishment." The trial court informed Defendant that he could not file a post-conviction petition against himself, and Defendant said that he understood. The following exchange then took place:

[Trial Court]:     You are going to lose that right. I understand that Mr. Kovach has discussed with you in detail various strategies that he thinks that you should pursue in this case; is that right?

[Defendant]:     Yes, sir.

[Trial Court]:     I understand that you disagree with his assessment of the case; is that right?

[Defendant]:     Yes, sir.

[Trial Court]: Do you understand that if you chose or elect to go a route different than the one that he is recommending that then you are going to lose benefits possibly of having that before the jury and you will certainly lose your right to raise those issues on appeal?

[Defendant]: Yes, sir.

[Trial Court]: Do you understand that your lack of training could place you at a significant disadvantage with the State's attorney's who are highly trained in criminal law?

[Defendant]: I understand that.

[Trial Court]: That they may be able to, I mean, they are going to have to comply with the rules of evidence and procedure as well but because of their extensive insight relative to your knowledge of the case that they may be able to accomplish things that they wouldn't otherwise be able to accomplish had you had benefit of counsel; do you understand that?

[Defendant]: Yes, sir. I do.

[Trial Court]: I think I mentioned this to you last week and I am mentioned [sic] it to you again yesterday afternoon that I think that you are absolutely foolish in attempting to represent yourself. Have I advised you that on at least this now being your third occasion?

[Defendant]: Yes, sir.

[Trial Court]: And in spite of all of the shortcomings and disadvantages that you have in representing yourself and knowing full well of the possible consequences of that self representation are you determined to proceed with this trial by representing yourself?

[Defendant]: Yes, sir.

| [Trial Court]: | Are you making this decision freely and voluntarily of your own free will? |
| [Defendant]: | Yes, sir. |

The prosecutor also questioned Defendant about his understanding of the possible sentence that he faced if convicted of first degree murder or any lesser-included offense, and Defendant said that he understood. When asked why he wanted to represent himself, Defendant said:

> Because I feel that for the last past two years since I have actually been sitting and studying my case myself and I know exactly what to present and Mr. Kovach is not prepared or even willing to present and because of him not being prepared I am able to actually present [sic] myself better.

He then explained that counsel had been preparing for a different strategy than he wanted to pursue. Defendant understood that he would be required to comply with all of the court rules, and he understood the proper procedure for questioning witnesses. He indicated that he also understood what could be included in opening and closing statements.

Trial counsel and Defendant then spoke for a few minutes, and counsel informed the court that he was willing give up his theory of self-defense and proceed to trial on Defendant's theory of defense. However, Defendant indicated that he still wished to represent himself. The trial court then made the following statement:

> All right. Just a few things that before I, well, first of all, I find that Mr. Jefferson is exercising his right to represent himself and that he has chosen to do so knowingly and intelligently and when I say intelligently it is not because I think it is a smart decision for him to make but that he is fully aware of all of the possible ramifications that may arise from it and he is aware of the significant serious nature of the charge against him and that he has been fully counseled on the various trial strategies in this case.
>
> He certainly understands the pitfalls that may arise during the course of these proceedings and the disadvantage that he faces in representing himself, nonetheless he chose to proceed in that manner anyway so the Court will grant him that right.
>
> I am going to appoint Mr. Kovach as stand-by counsel and I need to make a few things clear Mr. Kovach since you are simply stand-by counsel you cannot actively participate in any manner whatsoever. You cannot be nudging him

-15-

and standing up and objecting for him or doing any of the things that you probably routinely and normally do during the course of this trial.

You can sit there and you can respond to any questions that Mr. Jefferson may have of you, but you cannot take a proactive part in the trial of this case. You are basically on call for when Mr. Jefferson feels that he may want some guidance from you.

The trial court also stated that "[Defendant] has been fully advised of the consequences I believe of proceeding and has made a knowingly intelligent waiver to the right to his right of counsel and chooses instead to proceed with self representation."

We conclude that the trial court's questioning was in accordance with the guidelines contained in the *Bench Book*. We further conclude that the appellant knowingly and intelligently waived the right to the assistance of counsel.

Defendant asserts that his conviction in this case is "void" because there was no written waiver of counsel as required by Tenn. R. Crim. P. 44(b)(2). However, the record does contain the following acknowledgment, dated November 16, 2008, the day before the trial began, and signed by Defendant:

> I, Rodrickus Jefferson, do hereby acknowledge that Mr. Kovach has explained to me the crimes for which I am charged, what the State must prove beyond a reasonable doubt, possible punishments, given me all documents related to my case, and reviewed all relevant audio and video recordings associated with my case. Also, I acknowledge that Mr. Kovach has personally interviewed Eric Fleming, Fred Ewing, and Pam Keys. Furthermore, I have been advised that the State has made a plea bargain offer of 30 years at 100 percent to serve, and I do not accept that offer.
>
> Finally, I acknowledge that against Mr. Kovach's advice, I have advised Mr. Kovach that I do not wish to proceed on a theory of self defense. But rather, **I wish to defend myself on the theory that I was not present at the time of the alleged crime, for which I am charged, was committed**. I wish to put forth this defense against the advice of my attorney, despite the fact that multiple State witnesses have placed me in the room with the victim at the time of the shooting and I have made various phone calls from jail instructing people to speak with State witnesses.

(*Emphasis added*).

-16-

In *State v. Goodwin*, 909 S.W.2d 35 (Tenn. Crim. App. 1995), the record did not contain a waiver form signed by defendant to assert his intent to represent himself. However, the record did contain a Motion for Self-representation in which defendant asserted his desire to represent himself, and defendant also filed two other motions titled, "Motion for Court to Issue Order granting the Defendant Right to Self representation" which demonstrated "how determined Defendant was to represent himself." This Court held that the motions satisfied the requirement for a written waiver. *Id*. at 39. In *State v. Gregory Scott Battles*, No. W1998-00558-CCA-R3-CD, 1999 WL 1525475 at * 8, fn. 5 (Tenn. Crim. App. Dec. 30, 1999), this Court noted:

> Rule 44(a) of the Tennessee Rules of Criminal Procedure requires a written waiver of the defendant's right to counsel. Although the trial court requested the state to prepare a waiver, the record before us does not contain a written waiver of the defendant's right to counsel signed by the defendant.
>
> However, we note that the defendant has stated in each of his written motions that he was appearing in *propria persona*. We find that this assertion of self-representation is sufficient to satisfy the written waiver requirement because these motions were initiated by the defendant and the assertion was made repeatedly. Additionally, after he was questioned about the definition of in *propria persona* by the trial court, the defendant began using the term "pro se" in his motions and court filings.

Likewise in the present case, the acknowledgment signed by Defendant is sufficient to satisfy the requirement for a written waiver under Tenn. R. Crim. P. 44(b)(2).

Even if the waiver was not sufficient, this alone does not require a reversal of Defendant's conviction. In *State v. Simmie Black*, No. 02C01-9803-CR-00081, 1999 WL 280810 at *4, (Tenn. Crim. App. May 7, 1999) app. denied (Tenn. Sept. 25, 2000), the record did not contain a written waiver of defendant's right to counsel as required by rule 44(b)(2). This Court held: "While in no way condoning this omission, we have concluded from our review that such error was harmless and does not preclude a finding of actual waiver." It is clear from the record that Defendant was adamant about representing himself, and he knowingly and intelligently waived his right to counsel. Moreover, we note that the trial court allowed Defendant's court-appointed counsel, who was prepared for trial, to remain as elbow counsel to assist Defendant during trial.

### C. *Failure to Instruct the Jury on Self-Defense*

Finally, Defendant contends that the trial court in this case erred by failing to provide the jury with an instruction on self-defense based on evidence of an argument before the

shooting, and Ms. Sparks' testimony that Defendant told her that the victim "upped" on him with a gun. We disagree.

The defense of self-defense in Tennessee is defined as follows:

(a) A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

"It is the duty of a trial judge to give a complete charge of the law applicable to the facts of a case." *State v. Harbison,* 704 S.W.2d 314, 319 (Tenn.1986) (citing *State v. Thompson,* 519 S.W.2d 789, 792 (Tenn.1975)). In other words, "a defendant has a constitutional right to a correct and complete charge of the law." *State v. Teel,* 793 S.W.2d 236, 249 (Tenn.1990). "While the jury is the judge of the facts and the law, it is the duty of the jury to apply the law contained in the charge of the trial court to the ultimate facts determined by the jury." *State v. Williamson,* 919 S.W.2d 69, 80 (Tenn.Crim.App.1995). The question of whether or not an individual acted in self-defense is a factual determination to be made by the jury. *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). "The issue of the existence of a defense is not submitted to the jury unless it is fairly raised by the proof." T.C.A. § 39-11-203(c). According to the Sentencing Commission Comments: "The defendant has the burden of introducing admissible evidence that a defense is applicable. If the defense is at issue, the state must prove beyond a reasonable doubt that the defense does not apply."

After the close of proof in this case, there was a discussion concerning the jury instructions, and Defendant requested an instruction on self-defense. In support of his request, elbow counsel for Defendant pointed out that Lawanda Sparks testified that the victim "came up on him and he shot him with his own gun." The trial court noted that there had not been any testimony that placed Defendant in fear of serious bodily injury. Defendant then told the court that he did not intend to argue self-defense in his closing argument, and elbow counsel pointed out that Defendant was adamant about not arguing self-defense. Concerning this issue, in denying Defendant's motion for new trial, the trial court stated:

In the discovery there was evidence from at least one witness that would have supported an argument and a jury instruction on self-defense. [Defendant] absolutely did not want to go that direction, instead taking the position that he

-18-

was not anywhere around at the time of the shooting and someone else did it.

Because of the approach he took , even though there was some slight evidence I guess that could have been interpreted in a manner that might have supported the instructions for self-defense, Mr. Jefferson made it clear that's not the route he was traveling and, therefore, it really wasn't an issue for the jury to consider.

We do not believe that a review of the proof in this case supports a jury instruction on self-defense. Although there was some testimony that Defendant and the victim had an argument before the shooting, there was no testimony that the victim was threatening Defendant at the time of the shooting. The proof shows that the unarmed victim was sitting on the couch with his feet propped on a table playing video games. Pamela Key testified that she and Eric Fleming were arguing at the time of the shooting, but Defendant and the victim had no part of the argument. She said that Defendant pulled a gun out of his coat and shot the victim in the face without provocation. Chaston Nix testified that there was "no screaming or nothing" prior to the shooting. He testified that "[e]verything seems to be going pretty smooth I guess and the next thing I know I heard some glass breaking and stuff and it sounded like somebody could be wrestling or scuffling or something and then I heard a gunshot go off." Likewise, Fred Ewing testified that Defendant's demeanor before the shooting was "cool" and that he did not see anything going on before the shooting.

Although Lawanda Sparks testified that Defendant told her that the victim "upped on me with his gun," a complete reading of her testimony, as noted by the trial court, indicates that a period of time passed before the victim was shot. During her direct testimony, the following exchange took place:

[Prosecutor]:      What did he say happened after that?

[Ms. Sparks]:      I think he, I remember as far as I remember he was saying something like, you know, the argument was over or something, they might have sat back down or something and that is when he told me that he shot him with his own gun, and he had the gun.

[Prosecutor]:      And when you say he shot him with his own gun, you are saying that Mr. Jefferson said he shot the victim with his own gun?

[Ms. Sparks]:      Uh-huh.  (Affirmative.)

-19-

[Prosecutor]:     Okay. And just to go back a little bit you said that it was over, did he, what was he saying that made you think that the argument was over, if you remember?

[Ms. Sparks]:     He said something about sitting back down or something, smoking, I don't know. I don't remember.

[Prosecutor]:     Okay. Did he tell you at any point where the argument was?

[Ms. Sparks]:     No. He didn't say a place, but to me it sounded like it was in the house or something but I am not sure.

Ms. Sparks' testimony was further clarified on redirect examination:

[Prosecutor]:     Okay. And Mr. Jefferson specifically told you I shot the victim with his own gun?

[Ms. Sparks]:     Not in those words.

[Prosecutor]:     Okay.. What did he say exactly?

[Ms. Sparks]:     He said, the [n----r] upped on me with his gun and whatever he said in between that and he said I shot him and I took his gun.

[Prosecutor]:     And the stuff that you said that he said between that what was he saying?

[Ms. Sparks]:     He was explaining the situation, I really honestly don't know, I can't, I am not going to make it up but he was basically saying something about the altercation if there was one what happened with, you know, between the time that he had the first, the altercation and between the time that he was actually shot.

[Prosecutor]:     Okay.

[Ms. Sparks]:     Either they was smoking or talking or something and he was doing something.

[Prosecutor]: As if they had calmed down?

[Ms. Sparks]:        Yes.

Even if the trial court's failure to instruct the jury on self-defense was error, it was clearly harmless. As noted by the trial court, the evidence supporting an instruction was "very tenuous at best." Defendant did not suggest during his opening or closing statements that he acted in self-defense, nor during his examination of witnesses did he make the suggestion. In his own testimony, Defendant said that he was not in the room when the victim was shot, and he did not know who shot the victim. He then suggested that Eric Fleming may have shot the victim while trying to rob him. Defendant is not entitled to relief on this issue.

## CONCLUSION

After a thorough review, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE